IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | | |
|---|---|---|
| MALCOMB MARINE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-96-PT-1567-M |
| | ) | |
| ARCTCO SALES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This cause comes on to be heard on the defendant's Motion for Summary Judgment filed on April 3, 1997.

### BACKGROUND

Malcomb Marine is a seller of inland marine craft, engines, and parts, and services the same. Malcomb Marine was a dealer for ARCTCO Tiger Shark personal watercraft in 1993 through 1995. During the first two years, ARCTCO sent numerous notices to Malcomb Marine to "call-in" the Tiger Sharks from customers for repairs and modifications. Over time, ARCTCO changed the engine cowling design and the engine position for the 1994 boats and made substantial modifications to the steering controls and systems. Malcomb Marine claims that, due to the Tiger Shark's poor reliability, it began to lose money on the repairs[1] and customer goodwill. John Alfred Malcomb, Malcomb Marine's president and owner, testified that he was thus skeptical about purchasing new units for the 1995 season.

At a 1995 dealer show, Malcomb asked Larry Morton, an ARCTCO sales agent, if the company had corrected previous engineering and defect problems in the units. According to Malcomb, Morton said that the engineers had corrected the problems associated with past Tiger

---

[1] Malcomb Marine claims that ARCTCO's reimbursement program netted Malcomb Marine less than half of its normal labor rate.

Shark models.² Malcomb also testified that ARCTCO's "tech-reps" assured him that they had eliminated past defects and that the '95 model was one of the best units they had ever built. While at the dealer show, Malcomb drove what was, purportedly, an actual model of the '95 "Daytona."³ Based on ARCTCO's representations and his own observations, Malcomb decided to order a full inventory of the new units. Malcomb Marine received shipment of the units in early 1995. Approximately two months later, while most of the units were still in crates, Malcomb entered a "Dealer Agreement" for 1995.

Malcomb soon realized that the units he received had a different and perceived inferior hull design than the model ARCTCO had shown him.⁴ Malcomb sold three units, one of which the customer returned after a weekend's use. Soon afterwards, ARCTCO sent Malcomb Marine update kits and later replaced those kits with other update kits. Malcomb, however, refused to install the new update kits and quit selling the units out of customer safety concerns. He asked ARCTCO to take back the remaining units and to refund his money but ARCTCO refused.

### CONTENTIONS

Malcomb Marine contends that ARCTCO misrepresented that the units would conform to the model that ARCTCO showed at the dealer show. Malcomb Marine claims that ARCTCO changed the hull design between the ordering and receiving date and thus it was "nothing like" the model ordered. Malcomb also contends that ARCTCO misrepresented that the new units would not have substantial mechanical defects as in the past. Specifically, Malcomb Marine argues that

---

² Malcomb testified that Morton said, in part, "Well, you know, the first two years out you're going to have some problems, but we've got it all taken care of now so we're ready for a good year."

³ Malcomb admitted that ARCTCO planned one modification to the Daytona engine not reflected by the model.

⁴ Malcomb testified, "Well, the '95 Tigershark just rides awful. It bounces, it wets you. The Daytona model does. Because they did a major hull change in '95 and didn't tell me they were going to do that at the dealer meeting. They had a '94 Datyona at the dealer meeting for me to ride. They said, 'This is going to be what you get. It's going to have two carburetors on it.' And I went out and rode the '94 Daytona with one carburetor on it, and with two carburetors on it, it's supposed to, I think, give it eight more horsepower. But the units I got in was nothing like what I ordered. They made a total hull change, just ruined the riding of it."

ARCTCO misrepresented that the new units had been redesigned to avoid past problems.[5] Unfortunately, Malcomb Marine claims, ARCTCO immediately recalled the 1995 models and sent "update kits" that required extensive service work.

ARCTCO contends, however, that Malcomb Marine has failed to establish a prima facie case of fraud. Specifically, ARCTCO claims that it represented that the new units would not experience the same problems as in the past, not that the units would be problem free. ARCTCO argues that a boat with a "radically new hull design" experiencing the same problems that the old hull design encountered would be unimaginable. In any event, ARCTCO claims, the alleged misrepresentations amount to nothing more than mere puffery.

If the court concludes that the representations were more than puffing, ARCTCO contends that Malcomb Marine's complaint states a claim for promissory fraud -- that the representations sued on relate to how the 1995 units would do compared with previous units. Consequently, ARCTCO argues, Malcomb Marine must show that the promisor had no intention of carrying out its representations, but had a present intent to deceive at the time it made the representations. Regardless, it argues, Malcomb Marine could not have justifiably relied on any purported misrepresentations because the parties entered a written contract with a total integration clause that contradicts Malcomb Marine's claims.

## LEGAL STANDARD

On a motion for summary judgment, the court must assess the proof to see whether if a genuine need for trial exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is appropriate only if this court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S.

---

[5] Malcomb testified that Larry Morton "assured [him] that their engineering staff had been on it and they had built a good product and [sellers] wouldn't be having the problems that [they] had had in the past. He basically said that 'Well . . . the first two years out you're going to have some problems, but we've got it all taken care of now so we're ready for a good year.'" Malcomb also testified that the tech reps said that sellers would not experience problems and assured him that it was the best unit they had built.

242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment bears the initial responsibility of informing this court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. Id. at 323. Once the moving party has met this burden, the nonmoving party "must produce evidence that shows there exists a genuine issue of material fact." Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by affidavits, or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing that a genuine issue for trial exists. Celotex, 477 U.S. at 324. The court may consider the offered pleadings, depositions, answers to interrogatories, and admissions on file, with the affidavits, if any, in deciding whether to grant or deny a summary judgment motion. FED. R. CIV. P. 56(c). In making the determination of whether a given factual dispute requires submission to a jury, the court must view the presented evidence through the prism of the substantive evidentiary burden. Anderson, 477 U.S. at 254-55. The court, however, must avoid weighing conflicting evidence or making credibility determinations. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992).

      Considering the above, this court must examine the evidence to decide if a genuine issue of material fact exists.

## ANALYSIS

      The court concludes that Malcomb Marine has presented substantial evidence from which a trier of fact could find each element of a fraud claim. ARCTCO contends, however, that it represented that the new units would not experience the same problems as past units, not that the units would be problem free. It contends, moreover, that Malcomb Marine cannot show that the new units experienced the same problems as past units. Nevertheless, a reasonable jury could decide otherwise. ARCTCO initiated recalls and sent out "update kits" for its dealers to install on the "95" models. Problems apparently existed with the new models

and, according to Malcomb Marine, were similar to past problems. A genuine issue of fact therefore exists whether the units experienced problems that ARCTCO said they would not. Similarly, a genuine issue of fact exists concerning whether the shipped units substantially conformed to the models shown at the dealer show.

"Puffing" relates to statements of opinion and not statements of fact. The purported misrepresentations here were statements of fact concerning the quality of the units and not more generalized statements of opinion. See McGowan v. Chrysler Corp., 631 So. 2d 842 (Ala. 1993). Al Malcomb expressed his concerns about past ARCTCO units and asked if ARCTCO had corrected these problems. ARCTCO in turn seemingly acknowledged Malcomb's doubts and told him that the company had eliminated such problems. According to Malcomb, he would not have ordered the "95" line had he not received such assurances. Where statements, as here, bear on the essence of the transaction, those statements become statements of fact and are not mere puffery. See, e.g., Fidelity and Casualty Co. of New York v. J.D. Pittman Tractor Co., 244 Ala. 354, 13 So. 2d 669 (1943). The court concludes, moreover, that this action is not one for promissory fraud but is one based on an existing material fact. That is, the purported misrepresentations do not concern future performance but instead concern a statement of present quality. The elements of "intention not to perform" and "intent to mislead" are therefore inapplicable to this case.

ARCTCO also contends that Malcomb Marine could not have justifiably relied on any purported misrepresentations because the parties entered a written agreement that states, in part:

> [ARCTCO] makes no representations or warranties, express or implied (including any implied warranties of merchantability and fitness for any particular purpose), except those set forth in Company's current applicable published warranty policies and procedures.
>
> This Agreement is intended as a complete and exclusive statement of the understanding between the parties as to the subject matter of this agreement and supersedes all previous oral and written arrangement and discussions between the parties pertaining to these matters. It is clearly understood that no promise or representation not contained in this agreement was inducement to either party or was relied on by either party in entering into this agreement.

ARCTCO argues that this total integration clause did not contain the purported misrepresentations and thus Malcomb Marine could not have reasonably or justifiably relied to the contrary.

Initially, the court notes that the doctrine of justifiable reliance is irrelevant to the present situation. The doctrine is mainly used to bar recovery on purported misrepresentations when that plaintiff fails to read a contract and the purported misrepresentations are obviously contradictory to the written agreement. That situation is not present here. Nothing in the dealer agreement contradicts ARCTCO's purported misrepresentations. As such, the court cannot conclude, as a matter of law, that Malcomb Marine could not have justifiably relied on the alleged misrepresentations.

The court concludes that Malcomb Marine has presented sufficient evidence to overcome the summary judgment motion. Although close, the court cannot conclude as a matter of law that Malcomb Marine did not rely on a false representation of a material existing fact to its detriment. Summary judgment will accordingly be denied.

This 28 day of May, 1997.

Robert B. Propst
Senior United States District Judge